## State Text Book Commission v. Weathers, Jr.

(Decided June 13, 1919.)

### Appeal from Franklin Circuit Court.

1.  Schools and School Districts—State Text Book Commission—Adoption of Text Books—Duties—Failure to Perform—Mandamus —Right to Sue.—As the duties required by statute of the State Text Book Commission in the matter of adopting text books for the use of the common schools of the state are mandatory and purely ministerial, a failure on its part to legally perform them, as herein shown, authorized this action against the commission and the granting therein of the writ of mandamus to compel of it their performance as prescribed by the statute; and such failure of duty on the part of the commission being a matter that directly concerns the public generally rather than the state in its sovereign capacity, and there being no statute of the state making it the duty of any public officer to bring an action to compel of the commission the legal performance of its duties,

the right to sue for that purpose cannot be denied to any reputable citizen of the state and patron of its common schools, although he may be unable to show a special interest in the legal performance of the required duties by the commission. As the appellee belongs to the class designated, his right to maintain the action was properly allowed by the circuit court.

2. Schools and School Districts—State Text Book Commission—Duties—Adoption of Text Books—Sample or Specimen Copies.—As it is declared by the statute defining its duties that the State Text Book Commission in the selection and adoption of a uniform series of text books for the state from the sample copies furnished with the proposals or bids of publishers "shall consider the merits of the books, taking into consideration their subject matter, the printing, binding, material and mechanical qualities, their general suitability and desirability for the purposes intended and the price," it is indispensably necessary that all sample or specimen copies of books proposed for adoption by the Commission accompanying the proposals or bids filed by publishers with the secretary of the commission, and from which its selections of books are to be made, shall be exact reproductions in completed form of the books proposed in the bids. Therefore, samples consisting of segregated parts of the subject matter, printing, binding or material intended to compose the book submitted for adoption by the bidder and upon which the commission must act in making its adoption of the book, will not meet the requirements of the statute.

3. Schools and School Districts—State Text Book Commission—Adoption of Text Books—Sample Copies—Meaning of.—The fact that other state text book commissions or state authorities had previously, or even frequently, adopted text books for the state upon insufficient sample copies such as were furnished and used in this case, did not authorize or justify the acceptance or use of such insufficient sample copies by the present commission in making its adoption of text books. The doctrine of contemporaneous construction applies only where a statute is really uncertain, ambiguous and difficult of understanding; and does not apply, as in this case, where the meaning of the statute in its use of the words "sample" or "specimen copy" is plain, easily understood and hardly susceptible of misconstruction.

4. Schools and School Districts—State Text Book Commission—Adoption of Text Books.—It is clearly the meaning of the statute (sections 4421a-4, 4421a-5) First, that no change in school books is allowed within five years after an adoption is made and contracts with successful bidders are entered into by the commission for furnishing the books so adopted. Second, that at the next adoption fifty per cent of the books then in use under the former adoption, must again be adopted by the commission, if offered by the publishers at the same or a less price. Third, that

the commission may select the same books at a higher price, if the publishers will not continue them at the same price. Fourth, that fifty per cent of the books may be changed in any event at the adoption made at the beginning of each five year period. Fifth, that the manifest object of the statute in requiring the re-adoption at the beginning of each five year period of at least fifty per cent of the books then in use under the last previous adoption, if to be had at the same or a less price, is to afford school children and their parents or guardians, who must pay for school books used by them, the opportunity to procure books at the least possible cost and to be enabled to retain fifty per cent of the books from year to year, so that the same books can be used by several children of the same family, or even children of different families, through the five successive years.

5. Schools and School Districts—State Text Book Commission—Adoption of Text Books—Subjects.—It is not the meaning of the statute that in making the required adoption of books it is fifty per cent of the subjects taught in the schools under the former adoption, that must be retained by the State Text Book Commission. But its meaning is that fifty per cent of the books in use under the former adoption, regardless of subjects, must be again adopted by the commission, if offered by the publishers at the same or a less price. It is books and not subjects school children purchase and for books alone they pay. The Text Book Commission is without authority to select subjects taught in the schools. Subjects taught in the common school grades proper are fixed by statute; those taught in the high schools are selected and adopted by the State Board of Education.

6. Schools and School Districts—State Text Book Commission—Adoption of Text Books.—Having failed to adopt at the same or a less price fifty per cent of the books in use under the former adoption, the statute made it the duty of the commission to reject all bids made by publishers and at once readvertise for proposals from publishers whose text books were already in use and who might be willing to renew their contracts with the state and continue to furnish them at the same or less price; and also for bids for the furnishing of text books from publishers not having existing contracts for that purpose with the state, to be followed by a proper adoption of the necessary books in the manner prescribed by the statute.

7. Schools and School Districts—Adoption of Text Books—Mandatory Provision of Statute.—The mandatory provision of the statute which the State Text Book Commission must obey declares: "If it shall be impossible for the commission to arrange for a continuance of fifty per cent of the books then in use at a price equal to or less, the commission shall readvertise and proceed with the selection and adoption of such books as in the original manner. However the commission may select the same books at

a higher price, providing the publishers will not continue them at the same price."

CHARLES H. MORRIS, Attorney General, E. C. O'REAR and THOMAS W. THOMAS for appellant.

ELWOOD HAMILTON, LAWRENCE B. FINN, JAMES H. POLS-GROVE and THOMAS B. McGREGOR for appellee.

A. J. CARROLL, Amicus Curae.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

The State Text Book Commission, composed of the Governor of the state, ex-officio chairman, the Superintendent of Public Instruction, its ex-officio secretary, and ten other members appointed by the Governor, one from each of the seven appellate court districts of the state and one each from the faculties of the State University at Lexington, the Eastern State Normal School at Richmond and the Western State Normal School at Bowling Green, at a series of meetings, which began February 11, 1919, and continued about ten days, adopted an alleged complete list of text books for use in the common schools of the state, including high schools, during the ensuing five years, and awarded twenty-nine contracts therefor to alleged successful bidders. The meeting of February 11, 1919, was called by a resolution adopted by the commission at a previous meeting of January 14th, and newspaper advertisements on the 15th, for bids from publishers of school books, to be sent the board on or before February 11th.

The appellee, E. B. Weathers, Jr., a resident of Franklin, Kentucky, a city of the fourth class, substantially complaining that the appellant, State Text Book Commission, in the matter of adopting the list of text books for the common schools and awarding the contracts therefor, violated in numerous particulars the provisions of the statute defining its duties and regulating the manner of their performance; and that such derelictions, if not corrected, would result in great injury to the common schools of the state and loss to pupils and patrons, brought this action in his own right as a resident and citizen of the state and patron of its common schools, and on behalf of all citizens, patrons and pupils thereof, seeking a writ of mandamus to compel the appellant commission to reassemble and proceed as required

by the statute to a new adoption of text books for the use of the common schools during the succeeding five years, in lieu of those adopted on or following February 11, 1919.

Without quoting the averments of the petition, it is sufficient to say that they specify the following as errors or failures of duty committed by the commission in its recent adoption of text books for the common schools and in awarding contracts for supplying them, all or any of which, it is charged, rendered the adoption void: (1) That the accepted bids for three of the text books adopted were not accompanied by sample or specimen copies of such books as required by the statute; (2) that none of the bids stated the price to dealers in the counties; (3) that more than 50% of the books then in use were changed without readvertisement; (4) that books in use under prior contracts were adopted at higher prices than formerly paid; (5) that the commission did not advertise for proposals from those holding contracts under the former adoption for a continuance of their contracts at the same or lower prices. The several contentions of appellee set forth by the averments of the petition were traversed by the answer, which, in addition, alleged what was done by the commission in effecting its adoption of the list of text books in question; and, in the final paragraph, pleaded that appellee had no right to maintain the action. Numerous exhibits were filed with the petition and answer and these constitute the only evidence introduced by the parties. The case was submitted upon the pleadings and exhibits and decided by the circuit court in appellee's favor, its judgment sustaining each of his contentions and granting him the writ of mandamus prayed. The appellant, State Text Book Commission, excepted to the judgment and by this appeal urges its reversal.

We are met at the threshold of the case by appellant's challenge of the right of appellee to bring or maintain the action, and this contention will first be passed on. Appellee rests his right to maintain the action on two grounds. First, he claims that as the duties required of the State Text Book Commission by the statute are purely ministerial and also mandatory, if there was, as alleged, a failure on its part to legally perform them, the matter respecting which they were required by the statute to be performed being one that directly concerns the public generally rather than the state in its sovereign

capacity, and there being no statute of the state making it the duty of any public officer to bring an action to compel of the recalcitrant commission a proper performance of its duties, the right to bring an action for that purpose cannot be denied to any reputable citizen of the state and patron of its common schools, although he may be unable to show a special interest in the proper performance of the required duties by the commission; and, moreover, that such right of action in the citizen was recognized by this court in Gay v. Haggard, Road Supervisor, 133 Ky. 425, under substantially like conditions. It is true the plaintiff in that case was a taxpayer as well as a citizen, but that fact, though mentioned in the opinion, was not declared to furnish a decisive test of the plaintiff's right to sue out the writ of mandamus prayed, such right being more especially rested by the opinion, on the rule stated in the following excerpt quoted from 26 C. Y. C. 401:

"The true distinction seems to be that, where the right or duty in question affects the state in its sovereign capacity as distinguished from the people at large, the proceedings must be instituted by the proper public officer, but if the general public as distinguished from the state in its sovereign capacity is affected, any member of the state may sue out the writ."

Following its mention of the frequent application of the rule, *supra,* in cases in which one taxpayer had sued for himself and others, to restrain the levy of a tax or other excessive ministerial act, the opinion thus proceeds:

"It would seem to follow that where a ministerial act was required by law to be done, which if done would inure to the benefit of the public, the tardy official might be set in motion and compelled to act by a suit by one of the public affected suing on his own and on the behalf of others. Nor is it necessary that the plaintiff should show a special interest to be affected by the act. . . . Nor do we think it necessary to allege or to show that the public will sustain damage if the act is not done."

While the petition in the instant case does not allege that appellee is a taxpayer, it does allege his citizenship in the state and that he is a patron of its common schools; the first showing him to be a member of the state, and the last showing him to have a direct interest in the maintainance of its common schools, saying nothing of his being a contributor to the expense of such maintainance. So, in point of fact, he is not without some interest,

though not of a special character, that may be affected by the acts of the State Text Book Commission complained of. The doctrine that a private citizen or citizens having no special interest in the result may, as here attempted, move for a mandamus to enforce a public duty due the public, rather than to the state in its sovereign capacity, was also recognized in Lou. Home Tel. Co. v. City of Louisville, 130 Ky. 611, and later approved in Christian-Todd Tel. Co. v. Comlth., 156 Ky. 557. Indeed, such seems to be the preponderance of American authority. 13 Enc. P. P. 632; U. P. Ry. Co. v. Hall, 91 U. S. 343; State v. Weld, 39 Minor 426; Chicago, etc. Ry. Co. v. Suffern, 129 Ill. 274.

The second ground relied on as establishing appellee's right to maintain the action, is conferred, as claimed, by certain provisions of an act of the legislature approved March 29, 1918, now section 4421a-8 Kentucky Statutes (Carroll's ed 1918), in large part applicable to cities of the first, second, third and fourth classes. It will be observed that the section, *supra*, does not compel the cities of the classes mentioned to use the books adopted by the State Text Book Commission, but it does make it the duty of the secretary of the State Text Book Commission "to submit to the board of education of each of the said cities, a certified list of all books filed for adoption with the State Text Book Commission as soon as practicable after such bids have been received by the Text Book Commission, and also, a list of such books as have been adopted in said cities which may be continued for a period of five years." The cities, however, are left free by the section to adopt through their respective boards of education a series of books for a period of five years and contract with the publishers for them, but it requires that the five-year adoption of text books by the boards of education in these cities "shall be made within sixty days after the adoption has been made by the State Text Book Commission for the State of Kentucky," and in connection with such requirement declares: "And such adoption in the various cities may be made from the list of books certified by the State Text Book Commission. It being the intention of this act to permit uniformity in the State of Kentucky, and in said cities wherever possible."

The section, *supra*, further provides:

"All provisions of this section and the bonds required to be given by said publishers, shall be applicable to the sale of text books in such cities. Any city of the first, second, third and fourth classes may require bond to be made in favor of the board of education at the time of the making of the contract between said city and said publisher, or, it may relinquish such right, provided the publisher with whom a contract is made, has previously filed a bond with the State of Kentucky guaranteeing the faithful preformance of its contract with the state and with said cities. In this event, the city may rely for relief on the bond given to the State of Kentucky, should the contract be violated."

It cannot be said that citizens and patrons of the schools of cities of the classes mentioned have no interest in the work of the State Text Book Commission. On the contrary the connection between such cities and the work of the board appears to be established by the provisions of the section, *supra,* requiring its secretary to submit to the respective boards of education of the cities, as soon as practicable after the bids are received by the state board, a certified list of all books, accompanying such bids, filed with it for adoption; and, also, a list of such books previously adopted in the cities as may be continued for five years. In addition to the foregoing provisions is the further one which postpones the right of the respective city boards of education to make an adoption of books to within the sixty days succeeding the adoption that is made by the State Text Book Commission for the state. It is manifest from the foregoing provisions of the statute that it was intended by the legislature that the duties required of the State Text Book Commission, including its adoption of books for the state, entering into contracts with the publishers whose bids are accepted, and taking of the latter the necessary bonds, shall be performed before the boards of education of cities of the first, second, third and fourth classes are required to make their adoption of books for the schools of such cities, as in the absence of such previous action on the part of the State Text Book Commission the boards of education of the cities would be deprived of the information essential to the proper performance of their duties, and would have no opportunity, should they wish to do so, to avail themselves of the right contemplated by the statute and accorded by the bids of the publishers

accepted by the State Commission, to contract with them for the same books adopted by that board at the same prices; or, as permitted by the statute, to rely on the bonds given by such publishers to the State Commission, to enforce compliance with the terms of such contracts. It is patent that in no other way than that we have indicated, can there be the uniformity in the books of instruction adopted for use in the common schools of the cities of the state, expressly enjoined by the statute to be observed *wherever possible.''* Obviously, if there must be action by the State Text Book Commission before the city boards of education can perform the duties required of them, the action of the former, to be of any value to the latter, must be taken in the manner and according to the methods prescribed by the statute defining its duties.

While it is believed the first ground urged in support of appellee's right to maintain the action, is a safe one upon which to rest it, in view of the provisions of the statute, *supra,* we incline to the opinion that the second ground upon which he rests such right is also tenable. In other words, it would seem that a city of the fourth class, like Franklin, has such an interest in the action of the State Text Book Commission respecting the recent adoption of the text books in question, as will permit appellee, a resident thereof and patron of its common school, to sue for himself and on behalf of others similarly situated for the relief sought in the present action. With this question disposed of, it becomes necessary to consider whether such relief should be granted, or to what extent granted.

So much of the remainder of the Act of 1918 as is here involved is contained in Ky. Stats. (Carroll's ed. 1918), sections 4421a-3 to 4421a-10, inclusive (omitting sections 4421a-7 and 4421a-8, previously considered), which read as follows:

"Sec. 4421a-3. Meetings of Commission—Notice to Publishers.—The members of the State Text Book Commission as thus constituted shall meet within ten days after their appointment on the call of the chairman, or on a call signed by a majority of the members, in the office of the chairman, for the purposes of organization and to provide, as hereinafter stated, for proper notice to the various text book publishers regarding the adoption of text books for a period of five years in the State of

Kentucky. (Id. sec. 3, as amended March 29, 1918, c. 110, p. 453.)

"Sec. 4421a-4.  Advertisement for Bids—Proposals Concerning Renewal—Contract Prices.—At the first meeting of the State Text Book Commission as herein constituted, it shall advertise in one or more daily or other newspapers, or by written notification to all qualified publishers, as hereinafter provided, that said commission will receive sealed bids or proposals from the publishers of school text books on or before the first day of March preceding the expiration of the present or any future contracts for the adoption of text books in accordance with the provision of this law and such other regulations as the commission may prescribe. The commission will also receive at the same time written proposals from publishers who may at that time hold contracts with the State of Kentucky, or with any city of the first, second, third or fourth class, as to whether or not they will furnish and provide such books as are in use at the time for a period of five years from the date of the expiration of said contract at the same price or a less price. Such written statement shall be filed with the commission as stated above relating to the adoption or the continuation of said books for said period of time in either the state or in any of the above named cities; provided, that not more than fifty per cent of either the high school or the common school subjects, which are then in use in the public or high schools of the state, shall be changed, provided an arrangement may be made with the publishers of said books whereby the same books may be continued for a period of five years at a price equal to or less than the price at which books are sold at the time, but a continuation of fifty per cent. or any portion of books shall not be obligatory on any of such cities. (Id. sec. 4, as amended March 29, 1918, c. 110, p. 453.)

"Sec. 4421a-5.  Bids to Supply Books—Opened in Executive Session—Temporary Extension of Old Contracts—Changes in Text Books.—Such bids and proposals shall be for furnishing books during a period of five years. The bids shall state specifically the net contract price at which books are to be furnished to dealers within a county, and the exchange price, and shall be accompanied by a specimen copy of every book proposed to be furnished. Any person, corporation, company or association proposing to bid for a contract to furnish text

books under the provisions of this act shall lodge with his or its bid a sample copy of the text book proposed to be furnished, which text book, after contract is entered into, shall be safely kept in the office of the Superintendent of Public Instruction, and such person, company, corporation or association shall, during the existence of such contract, deliver to the dealer as provided in this act, text books equal in binding, finishing and material to said sample copy, and shall furnish the same under such contract at a price not exceeding the price at which the same or substantially the same book may be furnished or delivered to the dealer, patron or pupil in any other state of the United States. If such person, company, corporation or association fails, neglects or refuses to furnish text books under such contract as herein provided, a recovery on the bond provided herein may be had in any county in this state in which such failure, neglect or refusal may occur in an action by the county superintendent of such county on said bond. All bids shall be sealed and deposited with the secretary of the commission, to be by him delivered to the commission in executive session, when they shall be opened in the presence of the commision. It shall be the duty of the secretary of the commission to carefully preserve in his office for comparison the specimen copy of each of the books adopted, together with the original bid or proposal, and, when requested, to return to the publishers the specimen copies of other books submitted at their expense; provided, however, that when the present contracts then existing for the furnishing of text books shall have expired by the terms thereof, the commission shall arrange for a continuance of such contracts for a period of five years, on at least fifty per cent. of the subjects then in use, provided such contracts may be renewed or continued at the same or at a less price than that at which they are furnished at that time. The commission shall provide for the making of new contracts and new bonds, and the provisions of the text book law, as now amended, shall be followed with respect to the books which are continued, or the contracts which are renewed, as that on which new books are adopted. At the expiration of any new contract, and every five years thereafter, adoptions and renewals of contracts shall be made according to the provisions of the text book law. If it shall

be impossible for the commission to arrange for a continuation of fifty per cent of the books then in use at a price equal to or less, the commission shall readvertise and proceed with the selection and adoption of such books as in the original manner. However, the commission may select the same books at a higher price, provided the publishers will not continue them at the same price. (Id. sec. 5; March 4, 1916, c. 8, p. 18, sec. 1, as amended March 29, 1918, c. 110, p. 453, sec. 4.)

"Sec. 4421a-6.    Commission May Reject Bids.—The commission shall have and reserve the right to reject any and all bids for reasons satisfactory to a majority of the commission. In case of failure to select, from the bids submitted, a satisfactory text book upon any of the branches prescribed by law, the commission shall readvertise for sealed bids under the same terms and conditions and proceed with the adoption as in the first instance. (Id., sec. 6.)

"Sec. 4421a-9.    Merits of Book to be Considered.— The commission, in the selection and adoption of a uniform series of text books for the state, shall consider the merits of the books, taking into consideration their subject matter, the printing, binding, material and mechanical qualities, their general suitability and desirability for the purposes intended, and the price. (Id., sec. 9.)

"Sec. 4421a-10.    Branches of Study to be Included. —The unform series of text books to be selected by the commission shall include all branches required or that may hereinafter be required by law to be taught in the common, elementary and high schools of the state, except as herein provided; and no text book shall contain anything of a partisan, sectional or sectarian character. (Id., sec. 10.)"

The first complaint made of the action of the State Text Book Commission by appellee is, that the accepted bids for three of the text books adopted by it were not accompanied by sample or specimen copies of such books as required by the statute. The three adoptions referred to were, first a book on "Physiology, Hygiene and Sanitation," by Heizer, designed for use in the sixth, seventh and eighth school grades, only about thirty printed pages of which, together with a specimen of the quality of binding represented as intended for completing the book, was submitted by way of a sample copy

to the commission with the bid of the publisher, C. T. Dearing Printing Co., of Louisville; second, a book entitled "A Manual of Spelling for Elementary Schools;" by Philip W. & Wren J. Grinstead, only thirty-two printed pages of which, together with a specimen of the binding, was submitted by way of sample to the commission, with the bid of the publisher, Transylvania Book Co., of Lexington; third, a book entitled "Webster's Modern History," the only specimen of which was a page or a few pages of galley proof submitted by way of sample to the commission with the bid of the publisher, D. C. Heath & Co., of Chicago, Ill. Manifestly, the foregoing so-called specimens were not specimen or sample copies of the books described in the bids of the alleged publishers filed with the secretary of the commission, or of the books claimed to have been adopted by the commission.

The importance attached by the legislature to the office performed by the sample or specimen copy in the State Text Book Commission's adoption of school books for the state, is shown by more than one provision of the statute. Thus section 4421a-5, imperatively requires that any person, corporation, company or association proposing to bid for a contract to furnish text books under the provisions of the act *shall lodge with his or its bid a sample copy of the text book proposed to be furnished.* Not only is this sample copy for use by the commission in passing on the bids and making its selection of books, if the book of which the sample is a copy is one of those adopted, the sample copy has a further use that will continue for five years; for by another provision of the section it is required, after the contract between the publisher and the state is entered into, to be safely kept in the office of the Superintendent of Public Instruction during the existence of the contract, for comparison with the text books delivered by the publisher under the contract in order to determine whether such text books are equal in binding, finishing and material to the sample copy retained in the office of the Superintendent of Public Instruction.

By section 4421a-9 of the Statute, *supra,* it is further declared:

"The commision, in the selection and adoption of a uniform series of text books for the state, shall consider the merits of the books, taking into consideration

their subject matter, the printing, binding, material and mechanical qualities, their general suitability and desirability for the purposes intended, and the price.''

It is patent that in order for the state commission to obey the above mandatory rule governing it in the selection or adoption of school books for the state, it must have before it and, of necessity, rely upon the sample copies that accompany the proposals or bids filed with its secretary; hence, such sample copies must be exact reproductions in completed form of the text books proposed in the bids. Segregated parts of the subject matter, printing, or material intended to compose the book submitted by the bidder, and which, even if when put together or bound and finished after the adoption of the book, would be an exact copy of it as described in the publisher's bid or as described by the commission, will not meet the requirements of the statute. By the Century Dictionary the word ''copy'' is defined a ''completed reproduction.'' In Webster the definition is ''a transcript of the original.'' It is not material which of these definitions is preferred as either is sufficient. But it is obvious that the terms ''sample copy'' and ''specimen copy'' used in the statute are intended to be given the same meaning, both being used in the sense that the copy furnished the commission with the bid of the publisher must be the same book or reproduction of the book proposed by the bid for adoption by the commission. Therefore the words ''sample'' and ''specimen'' being purely descriptive are adjectives and not nouns. After all is said, it is the copy of the book proposed for adoption that must be submitted with the publisher's bid to the commission, the descriptive words ''sample'' and ''specimen'' preceding it being used, doubtless, to indicate that the copy required must be not merely a copy in substance, but a completed reproduction of the original.

Being of the opinion that the insufficiency of the alleged specimen copies furnished the State Text Book Commission of the three books in question rendered its adoption of them for the use of the common schools of the state illegal, it is our duty to declare, as we now do, such adoption and the contracts made for the state with the publishers resulting from the adoption, void. If it could be said that this conclusion needs any other

support than is furnished by the plain mandatory provisions of the statute, *supra,* it may be found in the following authorities; Johnson v. Ginn, 20 R. 1477; Johnson, et al. v. Weed-Pearson Printing Co., 74 N. Y. Sup. 373.

The fact, if it be a fact, that previous commissions, executive or ministerial officers have so construed the words "sample" and "specimen copy" appearing in the statute, *supra,* as to permit the use of incomplete samples or specimens such as were accepted in adopting the three books in question, cannot be relied on by the present commission as excusing their use of them. The doctrine of contemporaneous construction never applies where the language of the statute involved is so direct and clear as to express its own meaning, or render it susceptible of but one meaning. As said in Greene v. Gilbert, 168 Ky. 380:

"But this doctrine applies only where a statute is really uncertain, ambiguous and difficult of understanding, and does not apply, as in this case, where the meaning is plain, easily understood, and hardly susceptible of misconstruction. Bosworth, Auditor, v. Marshall Co. Atty., 165 Ky. 32."

In 36 Cyc. 1131, the doctrine is thus aptly stated:

"Primarily it is the function and duty of the courts to interpret the meaning of a statute, and where they can ascertain the legislative intent by the use of intrinsic aids alone resort to its contemporaneous construction by other persons is both unnecessary and improper. But where the language of the statute itself is ambiguous or uncertain, the opinions entertained by contemporaries as to its meaning are frequently the best guides to the legislative intent. On the principle of the contemporaneous exposition, common usage and practice under the statute or a course of conduct indicating 'a particular understanding of it, will frequently be of great value in determining its real meanings, especially where such has been acquiesced in by all parties concerned, and has extended over a long period of time. But no matter how long the usage has been established or how general the acquiescence in the customary construction, it will not be permitted to vary or to defeat the real intention of the legislature as expressed in the statute and interpreted by the courts."

As the words "sample copy" and "specimen copy" so well convey their own meaning, no reason is perceived for resorting to any other means of arriving at the sense in which they were intended by the legislature to be understood.

Appellee's second contention, that none of the bids received by the commission stated the prices of books to dealers in the counties, seems to find no support from the record. It will be found that the present statute, section 4421a-14, affecting this question, is a change from the former one. It will be observed that the section, *supra*, fixes automatically the retail prices at 15 per cent furnished on the net contract prices to the local dealers. Hence, it was only necessary that the bids state the net contract prices to dealers and exchange prices, the consumers' prices being 15 per cent additional to the net contract prices, and this information is contained in the bids. Besides, the answer, after traversing the allegations of the petition regarding this matter, in paragraph five affirmatively alleges that each of the bids received by the commission stated the net prices at which the books would be furnished to the dealers, as well as the exchange prices thereof, and as the bids are filed with the answer, the allegations of the answer on the subject and the information given by the bids, are admitted to be true by the demurrer. So it would seem that the second contention of appellee is without merit.

In order to intelligently consider the question raised by appellee's third contention, that more than 50 per cent of the school books then in use were changed by the commission, it will be necessary to determine first what changes in school books were permissible under the statute and the grounds upon which they could be made. It is clear from the provisions, contained in sections 4421a-4, 4421a-5 (1) that no change is allowed within five years after an adoption is made and contracts with successful bidders are entered into by the commission for furnishing the books so adopted; (2) that at the next adoption 50 per cent of the books then in use under the former adoption must again be adopted by the commission, if offered by the publishers at the same or a less price: (3) that the commission may select the same books at a higher price, if the publishers will not continue them at the same price; (4) that 50 per cent of the books may

be changed in any event at the adoption made at the beginning of each five year period. Manifestly the object of the statute is to conserve the interest of the school children of Kentucky by affording them and parents or guardians who must pay for school books used by them the opportunity to procure books at the least possible cost and to be enabled to retain at least fifty per cent of the books from year to year so that those used by children one year can be used in succeeding years by other children. The State Text Book Commission can make no selection of subjects for the subjects taught in the common schools are determined and adopted by statute, sec. 24, chap. 24, Acts 1916, and chap. 82, Acts 1918, and the subjects taught in the high schools are determined and adopted by the State Board of Education under powers conferred by statute (chap. 24, section 212, Acts 1915), whereas the duties of the State Text Book Commission are limited to providing, on the best terms possible, books required for teaching and studying the subjects prescribed by the statutes and State Board of Education. As well said by counsel: "The children of Kentucky do not buy and pay for subjects; they purchase and pay for books."

If it were the meaning of the statute, as argued by counsel for appellant, that books on fifty per cent of the subjects, regardless of the number of books, should be continued, in readopting the books on fifty per cent of the subjects it might result in the rejection of more than fifty per cent; indeed, as many as seventy-five per cent of the books in use under the former adoption. This would be so because the number of books devoted to the various subjects are not equal. In explanation of our meaning take this illustration furnished by one of the briefs. Suppose of twenty subjects there was a total of ten books used in teaching ten of them and a total of fifty books used in teaching the other ten subjects, the commission could, by selecting the first ten subjects, exclude eighty per cent of the books in use from readoption.

It will be found that the word "subjects" appears nowhere in the statute, *supra,* save in sections 4421a-4 and 4421a-5, and only once in each. Section 4421a-4, after directing the commission to receive proposals from publishers who have contracts with the state, or any city of the first, second, third and fourth class as to

whether they will continue to furnish for five years such books as are then in use at the same or a less price, contains this language: "Provided, that not more than fifty per cent of either the high school or the common school subjects which are then in use in the public or high schools of the state, shall be changed, provided an arrangement may be made with the publishers of said books whereby the same books may be continued for a period of five years at a price equal to or less than the price at which books are sold at the time, but a continuation of fifty per cent or any portion of books shall not be obligatory on any of such cities."

So much of section 4421a-5 as will be found pertinent is as follows:

"Provided, however, that when the present contracts then existing for the furnishing of text books shall have expired by the terms thereof, the commission shall arrange for a continuance of such contracts for a period of five years, on at least fifty per cent of the subjects then in use, provided, such contracts may be renewed or continued at the same or at a less price than that at which they are furnished at that time. If it shall be impossible for the commission to arrange for a continuation of fifty per cent of the books then in use at a price equal to or less, the commission shall readvertise and proceed with the selection and adoption of such books as in the original manner. However, the commission may select the same books at a higher price, provided the publishers will not continue them at the same price."

It must be confessed that the language of these sections is so ambiguous as to make its meaning difficult to comprehend, but if in undertaking to arrive at its meaning there is kept in mind the very obvious fact that the commission can no more change or drop subjects taught in the common or high schools than it can select them, the conclusion must be reached that it was the meaning of the legislature that fifty per cent of the books in use under the previous adoption, regardless of subjects, should be retained if they could be procured at the same or a less price. On the other hand, if the construction of the statute contended for by counsel for appellant should prevail, that is, that the books on fifty per cent of the subjects, regardless of the number of books, must be retained, if to be had at the same or a less price, it

would put it in the power of the commission to practically nullify the purposes of the statute by selecting the subjects in which but one book is used and excluding the subjects in which a number of books are used, which might result in the rejection of three-fourths of the books in use under the previous adoption. It is plainly the meaning of the sections, *supra,* that it is for books, not subjects, to be furnished that proposals or bids are to be made by publishers; that fifty per cent of the books, not subjects, then in use the commission must arrange to continue, if possible to be procured at the same or a less price; and lastly, it is for books and not subjects that the statute requires the commission to make contracts, and for the furnishing of the books adopted it must take bonds of the publishers whose bids have been accepted. To harmonize the many provisions contained in the numerous sections of the statute and give to it as a whole the meaning obviously intended by the legislature, the word "subjects" appearing in the sections, *supra,* must be regarded as referring to "books" and construed as if the word "books" instead of the word "subjects" were used. The rule that in interpreting a statute, all parts of it must be construed together in order to throw light upon and get at the meaning of any doubtful phrases or words it may contain, is so well recognized as to require little need of the citation of authority. But the following well known statement of the rule will be found in Bowman v. Hamlett, 159 Ky. 784: "It is well settled in this state that where words used in a statute do not convey the meaning intended by the legislature and where from the context and a general survey of the attending circumstances and a consideration of the subjects sought to be accomplished, the true intention is apparent, the words may be modified so as to express the legislative intent."

Yet another and equally as good statement of the rule is given in Comlth. v. Ward, 136 Ky. 146. "It is a familiar rule of statutory construction that all the sections of an act, if they be germane one to the other and relate to the same common subject, must be construed together, and apparently conflicting or contradictory provisions or sections reconciled so as to make, if practicable, one harmonious, intelligent whole that will express the legislative intent."

To the same effect are the following additional authorities: Hardy v. Russell, 181 Ky. 287; James, Auditor v. U. S. F. & G. Co., 133 Ky. 299; Com. v. Herald Pub. Co., 128 Ky. 424; Morrell Refrig. Car Co. v. Comlth., 128 Ky. 447.

In our view of the matter any other construction put upon the statute than that we give it, would put it in the power of publishers by combination or otherwise to increase the prices of books required for use in the public schools, to an extent that would be unjust and oppressive to the pupils and patrons thereof. But under the construction we give the statute the legislative intent would prevail, which is that it is mandatory upon the commission to readopt at least fifty per cent of the books in use under the previous adoption, if they are offered at the same or a less price, regardless of the subjects upon which they are designed to furnish instruction to the pupils. Of course we do not by the words, ''regardless of subjects,'' mean that the commission can in the readoption of books already in use or adopting new books, ignore the selection of subjects for the schools made by the statute and the State Board of Education. On the contrary it is bound by the selection of subjects made by the statute and board and must select books that embrace those subjects and give instruction in them; but in doing so it can make no change in subjects, or divide a subject into sections or fractional parts that would necessitate a change in any book in use under the previous adoption, or unnecessarily increase the number of books selected at the last or recent adoption. To explain our meaning, there appear to be in the list of newly adopted books on the one subject of ''writing,'' eight different books, entitled the ''New Writing Book Series,'' for beginners (N. H. Wright, author), contracted to be furnished by the publisher at $1.00 per dozen. Whether these are books of instruction, books containing copies to be imitated by pupils or both, we have been unable to discover, but we are at a loss to understand how a simple subject like writing can be so segregated in parts as to require eight books, all for beginners. Whether it was so ordered by statute, the State Board of Education or by arbitrary action of the State Text Book Commission is not disclosed by the record. On the other hand we can well understand

why various subjects, indeed the greater part of them, taught in the common schools will require several books to the subject, according to the age or grade of the pupil, but the duty of selecting or changing subjects or to determine whether a given subject shall be taught in part or one of its branches in the common school proper, in part in the high school or in a certain grade or grades of either, is either fixed by the statute or by it placed on the board of education. And when such classification is prescribed by statute or duty is performed by the board of education, it then becomes the duty of the State Text Book Commission to procure, in the manner prescribed by the statute, the books required for instructing pupils of the common schools in the subjects selected or changed by statute or the board of education.

Having answered appellee's third contention to the extent of indicating what changes in school books the commission were permitted by the statutue to make, in order to complete consideration of the question raised by the contention we must now determine what changes in such books were made by it. Consideration of the question is obstructed rather than aided by the commingling in the pleadings and in the briefs of counsel of changes in subjects and changes in books. But it is the claim of appellee that only four or 13-23/29 per cent of the books in use were readopted by the commission at the same price; two or 6-26/29 per cent of the books in use were readopted at a greater price; twenty-three or 79-9/29 per cent of books in use were rejected; and twenty-three or 79-9/29 per cent new books adopted.

On the other hand it is the claim of appellant that nineteen or 26-7 per cent of the books in use under the old adoption were readopted at the same price; that eighteen or 25-3/10 per cent of books of the old adoption were readopted at advanced prices; that thirty-four books of the old adoption were rejected; and that thirty-four or 47-8/10 per cent of new books were adopted.

If we accept these figures of appellant, rather than those of appellee, they show that of the 71 books that were in use under the old adoption, less than 50 per cent were readopted or continued in use by new adoption; and that the new adoption changed more than 50 per cent of the books in use under the old or former adoption without the readvertisement, goes without

saying, as it can not truthfully be denied. It is, however, contended by appellant that the readvertisement was not required as all publishers under existing contracts, though not included in the advertisement, did before the meeting of the State Text Book Commission at which the new adoption was made, have notice of the necessity of renewing them as well as of the time and place of doing so, and did in fact then make bids for that purpose. If it is true that all publishers under existing contracts had such notice and did, before or at the last adoption of books, make bids to the commission for continuing such contracts it would not be material, in view of the requirement of the statute that there be a readvertisement in the event of a failure, as here, to renew the contracts for 50 per cent of the books then in use at the same or a less price. The statute as to the advertising required of the commission is so explicit as to leave no doubt of its meaning. It speaks in section 4421a-4 of "proposals" as coming from publishers who hold existing contracts for furnishing books to the state or cities; and also of "bids" by which is obviously meant offers or propositions to furnish books to the state or cities by publishers who have no such contracts with the state; but the necessity of advertising for offers from both is equally required of the commission by the statute before making its adoption of books. It is not now necessary to determine, however, whether advertisement or notice of the meeting at which the state commission made its recent adoption of books was given publishers who had existing contracts with the state for furnishing books under the old adoption; the question to be determined is, whether the inability or failure of the commission to adopt 50 per cent of the books then in use, required a re-advertising for proposals and bids and another adoption of books. Of this there is no room for doubt, for it is so declared by section 4421a-5 of the statute, *supra,* in the following terms: "Provided, however, that when the present contracts then existing for the furnishing of text books shall have expired by the terms thereof, the commission shall arrange (i. e., by advertisement, etc., as in making the previous contract) for a continuance of such contracts for a period of five years . . . provided such contracts may be renewed or continued at the same or at a less price than that at which they are

770    KENTUCKY REPORTS.    [Vol. 184.

furnished at the time. . . . If it shall be impossible for the commission to arrange for a continuance of fifty per cent of the books then in use at a price equal to, or less, *the. commission shall readvertise and proceed with the selection and adoption of such books as in the original manner.* However, the commission may select the same books at a higher price, providing the publishers will not continue them at the same price."

If it be possible for the commission to arrange, that is, contract, for a continuance of 50 per cent of the books then in use at a price equal to or less, it must do so, if it be found *impossible* it *shall readvertise and proceed with the selection and adoption of the books as in the original manner.* Language can not be more mandatory in meaning or, by way of command, stronger in terms than is here employed. It leaves no alternative but to obey, and so specifically points out the manner in which such obedience is to be rendered, that the commission can not fail to understand it. So when it was discovered by the commission that it could not arrange for a continuance of 50 per cent of the books then in use at the same or a less price, it should have declared all bids and proposals off and at once readvertised for bids and proposals as in making the previous contracts. Having failed to take this course, it violated the mandatory provisions of the statute and thereby left the circuit court and this court as well no alternative but to declare its adoption of books in the manner attempted illegal and void. We are not prepared to say that if the commission had been able to readopt or continue 50 per cent of the books in use under the previous adoption, at the same or less price, that the readvertisement for further bids might not have been limited to such books as were not included in the 50 per cent of the books continued, but as the selection of 50 per cent of books in use at the same or less price was not made it would be useless to consider this question. It is apparent from what has been said that more than fifty per cent of the books in use under the former adoption, were changed by the commission without readvertisement.

The fourth complaint made in the petition that books in use under prior contracts were adopted at higher prices than paid under those contracts is sustained by

the record, and the number of books so adopted is stated in another part of the opinion.

The fifth and final complaint, that the commission did not advertise for proposals from those holding existing contracts for furnishing books under the former adoption, is likewise sustained by the record. The advertisement made by the commission for bids did not include any specific notice to or demand upon publishers holding existing contracts whereby books were being furnished under the former adoption, to submit proposals for a continuance of their contracts at the same or lower prices, as required by the statute. But as this contention has already been sufficiently considered in the opinion, further discussion of it is unnecessary.

In conclusion, it is not improper to say that the importance of this case to the common school system of the state has led us to give it the fullest consideration possible in the limited time allowed. The statute controlling the questions involved needs amending in numerous material particulars, that its ambiguities may be removed and its meaning made so clear that further misunderstanding of its import on the part of the State Text Book Commission or others charged with its enforcement, may be avoided. The petition charges neither bad faith nor corruption on the part of the commission in its recent adoption of text books for the common schools of the state, and neither is shown by the record. But it is apparent that there has been a faiuure on the part of the commission to perform certain ministerial duties, enjoined by the statute, which are mandatory and so clearly defined that the very manner of their performance is prescribed. These duties the commission must yet perform as required by the statute. Hence, the granting of the mandamus by the circuit court was not error. The case was considered by six judges of this court, Chief Justice Carroll, being necessarily absent, did not sit. The six judges sitting concur in all the conclusions expressed in the opinion, except that sustaining the right of the appellee to maintain this action, as to which the court is equally divided, Judges Settle, Clarke and Sampson holding that he has such right, and Judges Hurt, Thomas and Quin that he has not.

Judgment affirmed.