## FUNK & WAGNALLS CO. v. AMERICAN BOOK CO.

(District Court, S. D. New York. August 4, 1926.)

1. **Words and phrases—"Text-book," as used by state school authorities, includes dictionaries.**

The term "text-book," as administratively defined by state school authorities of numerous states and by courts, is broad enough to include dictionaries.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Text-Book.]

2. **Schools and school districts ⟊167—State text-book commission held authorized to adopt dictionary as a text-book, to be used to exclusion of all others (Ky. St. §§ 4382, 4421a7, 4421a17).**

Under Ky. St. §§ 4382, 4421a7, 4421a17, which require the state text-book commission to adopt a uniform system of text-books, which shall be used in the schools to the exclusion of all others, and to arrange for their purchase and distribution, the commission *held* to have authority to adopt a dictionary as a text-book, and when so adopted and its purchase contracted for, though listed as a supplemental book, purchase and use of which by pupils is not com-

pulsory, but optional, it is entitled to the protection of the statutory provision that it shall be used to the exclusion of all others.

3. **Trade-marks and trade-names and unfair competition ⟊68—Inducing county superintendents of schools to circulate unauthorized lists of text-books, in which defendant's dictionary was substituted for complainant's, legally adopted, held unfair competition (Ky. St. § 4421a7).**

The state text-book commission of Kentucky adopted complainant's dictionary as one of the text-books for exclusive use in the schools, as authorized by Ky. St. § 4421a7, and made a five-year contract with complainant for their purchase. County superintendents are required to furnish the official list of text-books to all dealers and principal teachers. Defendant, publisher of another dictionary, induced county superintendents to distribute lists, which it furnished, in which its dictionary was listed, instead of complainant's, and. recommended. *Held*, that such action by defendant constituted unfair competition, and that complainant was entitled to an injunction.

In Equity. Suit by the Funk & Wagnalls Company against the American Book Company. On motion by complainant for preliminary injunction. Granted.

William Beverly Winslow, of New York City (Charles E. Hughes and Charles E. Hughes, Jr., both of New York City, of counsel), for complainant.

Leonard D. Baldwin, of New York City (Martin Conboy, Peter F. McAllister, and Henry T. Hall, all of New York City, of counsel), for defendant.

AUGUSTUS N. HAND, District Judge. This is a motion for a preliminary injunction in a suit for unfair competition. The bill of complaint alleges that complainant publishes a "Comprehensive Standard Dictionary," adapted for use in elementary grades of public schools, and a "Desk Standard Dictionary," which is adapted for use in high schools; that the state text-book commission of Kentucky adopted these dictionaries for use in schools, and the complainant entered into a contract with the state to furnish these dictionaries at specified prices for a period of five years. In these circumstances the bill alleges that the defendant procured the circulation through the county school superintendents of lists of school books in which defendant's dictionary known as "Webster's Elementary School Dictionary" was substituted for complainant's, with the result that the public was given the impression that defendant's dictionary was the officially adopted dictionary.

Defendant's answer alleges that the contract between the complainant and the state

text-book commission was unlawful, and in substance rests upon the position that the field was clear, and it had a right to do what it did.

The laws of Kentucky create a board of education, in addition to the state text-book commission, and provide that "the instruction prescribed by the board shall embrace spelling, reading, writing, arithmetic, English grammar, English composition, geography, physiology and hygiene, civil government, United States history, and the history of Kentucky." Ky. St. § 4383.

The laws of Kentucky require the commission to adopt "a uniform series or system of text-books for use in the common schools and the high schools of the state, except in cities of the first, second, third and fourth classes, and to arrange for the distribution and sale of such books to dealers at the net contract price. The commission may from time to time make any regulations not contrary to the provisions of this act to secure the prompt and faithful performance of all contracts and the prompt distribution of the books herein provided for." Ky. St. § 4421a7.

The act goes on to provide that on or before the 1st of August in each year the state board of education shall have printed a complete list of all the books so adopted, and distribute such lists to the county superintendents in such quantities as they may request and that it shall be the duty of those superintendents to furnish these lists to dealers and school teachers.

It is also provided in the act (Ky. St. § 4421a17) that "the books adopted by the commission as the uniform system of text-books for the state shall be introduced and used as text-books to the exclusion of all others in all the common schools and high schools of the state, except as herein provided, for a period of five years from the date of adoption; and it shall not be lawful for any teacher or other school officer to use or for any board of education to permit to be used, any books upon the same branches other than those adopted by the commission. However, nothing herein shall prevent the use of supplementary text-books, but such supplementary books shall not be used to the exclusion of the books prescribed under the provisions of this act. Any member or members of any board of education, any trustee or teacher, violating the provisions of this section, shall be deemed guilty of a misdemeanor, and upon conviction be punished by a fine of not less than ten dollars nor more than fifty dollars and all such fines shall be covered into the treasury to the credit of the school fund of the county in which such fine may be assessed."

The act also provides (section 4421a9): *Merits of Book to be Considered.*—The commission, in the selection and adoption of a uniform series of text-books for the state, shall consider the merits of the books, taking into consideration their subject-matter, the printing, binding, material and mechanical qualities, their general suitability and desirability for the purposes intended, and the price."

Section 4421a10: *"Branches of Study to be Included.*—The uniform series of text-books to be selected by the commission shall include all branches required or that may hereafter be required by law to be taught in the common, elementary and high schools of the state, except as herein provided; and no text-book shall contain anything of a partisan, sectional or sectarian character."

Section 4382: *"Powers and Duties—Standing Committee.*—The state board of education shall constitute a standing committee, who shall prepare rules, by-laws and regulations for the government of the common schools of the state, which shall be adopted and enforced under the authority and direction of the county superintendents, trustees and teachers; shall prescribe regulations for the management of county teachers' libraries, and prepare suitable lists of books for subdistrict libraries with regulations for the management thereof; shall prescribe and publish a public graded course of study for the common schools, specifying the order of studies and the time to be allotted to each, which course of study shall be observed by the teacher and enforced by the trustees."

In pursuance of the foregoing requirement to "prescribe and publish a public graded course of study for the common schools," the state board of education adopted such an elementary course of study by order of May 20, 1925, which is set forth in a pamphlet (Complainant's Exhibit 9) known as "Kentucky State Course of Study and Teachers' Manual for the Elementary Schools 1925–1929."

Under "Chapter V—Spelling," at page 50 of the manual, the following advice appears: *"Use of Dictionary.*—The teacher will render a distinct service if the pupils above the primary grades are taught how to use a dictionary and are trained to consult its pages until such consultation becomes habitual. This should be done in connection with all lessons, in correlation with all subjects."

At page 51 of the manual, under "Chap-

ter V—Spelling," there is also found: *"Out-line of Course of Spelling.*—No outline of the course in spelling is provided here, since the adopted text-book in spelling outlines the work by years."

At page 251 of the manual, in Chapter XXI, relating to "School Equipment," it is said: *"Text-books—Basal, Supplemental, and Supplementary.*—Effective school work cannot be done without an adequate supply of text-books. This is a fundamental requirement in school equipment and should have the attention of both teacher and patrons. The teacher should be supplied with all text-books used in the school; and it is absolutely necessary that all pupils be supplied with the necessary basal text-books, and when possible with the supplemental, and then the supplementary books."

In the manual, at pages 258 to 262, is printed an "Official List of the Text-Books and Prices for Elementary Schools." This list has subdivisions entitled "Basal," "Supplemental Text," and "Supplementary Readings." In the category of the supplemental texts are found "Teachers' Manual for Pilot Arithmetic," "Golden Deeds for Character Education," "Elementary Home Economics," and a series of readers additional to the basal set and Funk & Wagnalls Comprehensive Standard Dictionary. The "supplementary readings" appear to consist of books presenting in story or other form especially attractive to the young natural history, history, and geography—quite manifestly a set of books of an educational sort for the general reading of children, rather than for their definite study.

The "official" list was adopted by the commission in 1924 and sent by it to all county superintendents on or before May 10th of that year. It is to be noted, however, that the state board of education seems to have sent out a list containing only the basal texts adopted by the commission, but none of the supplemental texts or supplementary readings. On May 1, 1924, the commission entered into a contract with the complainant whereby the latter agreed to furnish for a period of five years from and after July 15, 1924, at a specified price, "Supplemental Text—Grades," "Comprehensive Standard Dictionary," "Fernald Vizetelly," to the authorized agents appointed by the county boards of education in each county for the exclusive use in the common schools.

The defendant printed at its own expense lists of books for the year 1924-25 containing the "basal texts" adopted by the state commission, but none of the "supplemental texts" or "supplementary readings" so adopted, and containing therein "Webster's Elementary School Dictionary," as well as certain other books not adopted by the commission. Webster's Elementary School Dictionary and the other books in the list printed by the defendant are in black-faced type and under the heading "supplemental."

The defendant, to promote the sales of its Webster's Elementary School Dictionary, induced the county superintendents to circulate the printed lists. One of those lists, subscribed by the county superintendent of Jefferson county (a copy of which is attached to the complaint), contained the statement that "it is recommended by your state superintendent, Professor McHenry Rhoads, and all progressive state, city, and county superintendents, that every student should have a dictionary of his own and be taught its value and use," and also the recommendation, by the county superintendent subscribing the list: "This is the official book list for the county schools. I recommend Webster's Elementary School Dictionary and the supplementary books included above."

Lists for the year 1925-26 were likewise printed and furnished by the defendant and promulgated by the county superintendents. Because of a protest by the complainant as to the 1924-25 lists, the 1925-26 lists were modified, so that they did not say in terms that they were the official lists of the county schools, but limited the statement subscribed by the county superintendents to the words: "Supplemental books listed in black-faced type recommended by * * * county superintendent."

Each county in Kentucky has a board of education and the statute provides (section 4399a4): *"Powers and Duties of Board.*—Subject to the course of study and to the bylaws and policies of the state board of education, the county board of education shall determine by the consent and advice of the county superintendent the educational policies of the county, and shall prescribe rules and regulations for the conduct and management of the schools. The county board of education shall exercise through its executive officer, the county superintendent and his professional assistants, control and supervision over the schools of the county. * * * *"

It seems probable that there has been a difference in opinion between the state board of education and the state text-book commission as to the authority of the latter, or the meaning of its action. The commission attempted to divide books which they adopted into the categories of basal, supplemental,

and supplementary reading. Complainant says that under this classification only the basal texts *need* be used by pupils; yet, if other books are used in the prescribed courses in the schools, the pupils must in the first instance purchase the supplemental or supplementary books adopted by the commission. The state board of education is given sole authority to prescribe a course of instruction and to select the subjects to be studied so long as these subjects embrace or include those required by the statute (section 4383) which is quoted above. State Text-Book Commission v. Weathers, 184 Ky. 748, 213 S. W. 207.

It is to be remembered that the state board of education sent out a list of books containing the basal texts adopted by the commission, and no supplemental text or supplementary readings so adopted, and also that two state superintendents of education have expressed the opinion that when complainant's dictionary was adopted as *supplemental* the action of the commission amounted legally only to a recommendation of the book, and it was optional with the county boards to use them if they desired, or, if they preferred, to use Webster's Dictionary, or any other. See copy of letter of State Superintendent McHenry Rhoads, dated April 30, 1924, in affidavit of George A. Read, verified June 2, 1926; also copy of letter of State Superintendent Colvin, dated June 25, in same affidavit, and to the same general effect.

The opinion of the Attorney General of Kentucky dated August 14, 1919, indicates a similar interpretation of the adoption of supplementary books by the state commission. The opinion of the Attorney General of the state in the interpretation of a public statute is always entitled to weight, and by section 4396 of the Kentucky Statutes, state superintendents are made judges of "any question of difference or doubt touching the administrative duties of officers" of schools. It is not suggested that these opinions have the same kind of bearing on the construction of the statute as contemporaneous reports of legislative committees in connection with its enactment would have; but they are of weight where a court, as here, has to deal with a new subject. They, as well as the action of the commission, are worthy of consideration in seeking to determine the scope of the commission's authority.

The complainant argues that "supplemental" and "supplementary," as used by the commission in classifying text-books which it has adopted, is different from the meaning of "supplementary" in the statute, where it says: "However, nothing herein shall prevent the use of supplementary text-books, but such supplementary books shall not be used to the exclusion of the books prescribed under the provisions of this act." Ky. St. § 4421a17. In other words, the complainant says that the words in the commission's list of adopted books describe and constitute a classification of texts, all of which have been lawfully adopted, and must be used to the exclusion of all other books until they are first owned, whereas the word "supplementary" in the statute refers only to texts outside all of the adopted books.

The primary questions are: (1) Is complainant's dictionary a text-book? (2) If so, did the state commission have the authority to adopt supplemental or supplementary books?

[1] In spite of the fact that the words "text-book" must naturally indicate a treatise in a particular field of knowledge, or, as the Century Dictionary says, "a book used by students as a standard work for a particular branch of study, * * *" yet it cannot be limited to books formally classified by the author as expounding one of the subjects of instruction selected by the state board of education. Such an interpretation has not prevailed in numerous states where the selection of text-books has been intrusted to public authority, and would, I believe, prove unworkable and undesirable in practice. The administrative construction of the words "text-book" has been broad enough to include dictionaries, not only in the state of Kentucky, but also in Alabama, Arkansas, Delaware, Florida, Louisiana, Michigan, Montana, and Virginia, and the words were given a broad judicial interpretation in the cases of Affholder v. State, 51 Neb. 91, 70 N. W. 544, and People v. Board of Education, 175 Ill. 9, 51 N. E. 633.

A dictionary might be used as, and is in effect, a spelling book, giving definitions of the words spelled, and is auxiliary to almost every branch taught. It would seem to me quite too narrow a limitation of the authority of the only board having power to select and adopt the books for a prescribed course of study, if it could not adopt a book so constantly useful for educational purposes to pupils of all ages. I can see very little substance in the contention that a dictionary is not within the field of text-books, and defendant's argument seems to have been met by the wide use by state departments of education of the term to include dictionaries.

[2] The answer to the question whether the

commission had power to adopt supplemental or supplementary books for use as text-books, to the exclusion of all others in all the common schools, depends on their right to classify the books which they adopt. The state board of education is required (section 4382) to "prescribe and publish a public graded course of study for the common schools, specifying the order of studies. * * *" The commission is required (section 4421a7) "to adopt * * * a uniform series or system of text-books." Now it seems reasonable to suppose that the commission could adopt one set of books for precocious pupils, who got high rank, and another for backward ones; that, for example, advanced students in United States history might be given books involving a more special treatment of history in its political or constitutional aspect than the ordinary school history affords. In a similar way, I think the commission may adopt further books for study for pupils whose inclination or larger means makes their acquisition desirable. This seems to be a reasonable power of classification incidental to the right to adopt at all, and the adoption of a book as a text-book, if it can be properly called such, and if it bears directly on the subjects selected by the board of education, removes it from those books termed "supplementary" in the statute, which may be used, but not "to the exclusion of the books prescribed." Section 4421a17.

It is always to be remembered that "the books adopted by the commission as the uniform system of text-books for the state shall be introduced and used to the exclusion of all others. * * *" If county boards can vary the list, "the uniform system of text-books" which the statute aims at will be destroyed. It is not necessary to go the length of complainant's contention, and to hold that the commission can do more than recommend the books in its list termed "Supplementary Readings." Many of them may perhaps not fall within the natural meaning of text-books, and it is doubtful whether the commission intended to adopt them as such when they are preceded by the caption "Supplementary Readings," or designed to do more than to recommend their use. But complainant's dictionary I hold to have been properly adopted as a *text-book,* and not to be excluded from the protection of the statute because classified as a book that pupils need not buy, who do not wish any dictionary for use in school or cannot afford to pay for.

It is unnecessary to defend such a detailed system of selecting books as is provided for, or at least sanctioned, by the Kentucky laws, and many may differ with its policy; but the statute controls, and I think the commission conformed to it in adopting complainant's dictionary. Certainly a uniform system will not prevail if 120 counties are free to urge the use of alternative books every time the commission adopts a book of direct bearing upon the prescribed course, but in order to save pupils expense does not require it to be purchased in all cases. The statute provides (section 4421a16, at page 278 of Complainant's Exhibit 1) that the county superintendents are to furnish the *official* lists to all dealers and the principal teachers of all schools in the county. These lists, and not original, ones of their own choice, the superintendents were bound to promulgate.

If I am right in the foregoing, there is no sufficient basis for the defendant's contention that the county superintendents could issue lists omitting complainant's dictionary, including defendant's, and asserting such lists to be official. The defendant induced and aided this action and furnished the lists. The first list (Exhibit C, attached to the bill) was deceptive, and the second unlawful, because it omitted complainant's book and violated the statute. The whole defense must turn on whether the county superintendents were authorized to ignore the action of the commission and do what they did. If they were not, the defendant could not contribute to such a legal wrong by furnishing the lists and inducing their distribution in promotion of its own interests. The case has been difficult, because the use of the word "supplementary" in section 4421a17 of the Kentucky Statutes made the use of the word "supplemental" by the commission perplexing; but a careful consideration of the Kentucky Statutes and manual, and the very interesting briefs, satisfies me that the state commission had authority to adopt complainant's dictionary as a text-book which must be used in the schools in the first instance.

[3] If this be so, the case comes within the doctrine of Ely-Norris Safe Co. v. Mosler Safe Co. (C. C. A.) 7 F.(2d) 603, and the defendant has been guilty of unfair trade, which it threatens to continue. A further line of cases seems to be almost equally pertinent. If it is a tort for C. to persuade B. to break his contract with A., or by false representations to persuade B. not to deal with A., or to sell B. material for use in manufacturing a machine to infringe A.'s patent—if A. can sue for all these wrongs, I cannot see how threats to interfere with complainant's

contract right to have its dictionary promulgated by the county superintendents as the statute requires can fail to give rise to an analogous right of action. Lumley v. Gye, 2 El. & Bl. 216; Quinn v. Leathem, L. R. [1901] A. C. 495; Rice v. Manley, 66 N. Y. 82, 23 Am. Rep. 30; Henry v. Dick, 224 U. S. 1, 32 S. Ct. 364, 56 L. Ed. 645, Ann. Cas. 1913D, 880; Individual Drinking Co. v. Errett (D. C.) 300 F. at page 960. Indeed, the historic opinion of Chief Justice Holt in Keeble v. Hickeringill, 11 East, 573, may also be cited.

The motion for a preliminary injunction is granted. Settle order on notice.