# W. Verner Mills, County Superintendent of Schools for Kenton County v. Schoberg.

(Decided October 26, 1926.)

## Appeal from Kenton Circuit Court.

Schools and School Districts—Under Statute, State Text Book Commission Held Authorized Only to Prescribe Texts for Subjects Required by Statute to be Taught, and Its Designation of Supplementary Books did Not Exclude Designation by Local Authorities (Kentucky Statutes, Sections 4369b-1 to 4369b-4, 4382, 4383, 4421a-7, 4421a-10, 4421a-16, 4421a-17, and 4421a-20).—Under Kentucky Statutes, sections 4369b-1 to 4369b-4, 4382, 4383, 4421a-7, 4421a-10, 4421a-16, 4421a-17, and 4421a-20, State Text Book Commission has authority to make a binding, exclusive adoption of text books for the common elementary schools on only the subjects required by statute to be taught, and one text book only for each subject; hence its designation of supplementary books or texts was recommendatory only, and did not prevent local authorities

from recommending other books or give publishers of designated books any right to furnish them.

RODNEY G. BRYSON for appellant.

GALVIN & TRACY for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE THOMAS—Affirming.

The appellee and plaintiff below, Mary Schoberg, is a dealer in school books, her place of business being located in the town of Independence, in Kenton county, Kentucky, within which and around which public schools are conducted. For many years prior to August 4, 1926, she had supplied herself with not only the adopted text books made by the State Text Book Commission, but also with such supplementary books as were recommended by the county school superintendent, who was the appellant and defendant below, W. Verner Mills, and in which latter class of books was Webster's "Elementary Dictionary," Carpenter's "Around the World with Children," and "Story Hour Readers."

On the date mentioned (August 4, 1926) Judge Augustus N. Hand, the District Federal Judge for the Southern Federal District of the State of New York, rendered an opinion in the case then pending before him of Funk & Wagnalls Company v. American Book Company, in which he construed the applicable sections of our statutes to authorize the State Text Book Commission to make a mandatory selection of supplementary books to be used by the students in the public schools of Kentucky, the same as that board must do with reference to text or *basal* books upon the subjects required by statute to be taught in the public schools. He also found that at the last selection of books by the State Text Book Commission it had placed under a list of *supplementary books* other publications than the ones above mentioned, including the "Comprehensive Standard Dictionary" in lieu of Webster's "Elementary Dictionary," and other publications in lieu of the other two mentioned as having been recommended for the schools of Kenton county. Notwithstanding such supplementary books were placed by the State Text Book Commission under the head of "supplementary books," the federal judge *supra,* held that in doing so the recommendation so made was mandatory and that no other substitute supplementary books

could be used in the public schools of the Commonwealth except those recommended, in the manner indicated, by the State Text Book Commission. After the rendition of that opinion on the date aforesaid, defendant herein announced that he would exclude from use in the public schools of Kenton county. Webster's "Elementary Dictionary" as well as all other theretofore supplied supplementary books that were not contained in the supplementary lists made by the State Text Book Commission; and this declaratory judgment action was brought in the Kenton circuit court by plaintiff against defendant seeking an interpretation of our applicable statutes upon the subject, and to obtain a declaration of the extent and power of the State Text Book Commission in the recommendation of books to be used in the public schools, and to enjoin defendant from excluding from use in the public schools the supplementary books that he had threatened to do, as above mentioned.

The answer admitted the facts stated in the petition and joined in the prayer for a declaratory judgment settling the questions involved. Hon. Leslie T. Applegate, the learned judge in the court below to whom the cause was finally submitted, held in a very logically written opinion, the reasoning of which we deem conclusive, that the State Text Book Commission is vested by statute with no authority to mandatorily adopt any books for use in the public schools of the Commonwealth except text books (called by the board in its adoption "basal" books) and that its effort to do so with reference to supplemental or supplementary books would not be binding upon the local school authorities so as to require the exclusion of other supplemental or supplementary books if the local school authorities so desired and recommended. But the transcript filed in this court does not show that defendant was enjoined as prayed for in the petition, and defendant prosecutes this appeal therefrom.

The written opinion of the learned trial judge, above referred to, states and determines the legal questions involved with such complete clearness and unanswerable reasoning that we are convinced we can not improve upon it, and since it announces what we now hold is the correct interpretation we have concluded to adopt it as a part of our opinion in so far as it relates to the questions discussed and disposed of therein. The portions thereof which we so adopt are:

"The question presented by this record goes to the extent of the power of the Kentucky State Text Book Commission to make a binding adoption of text books for use in the common or elementary schools of the state. More concretely expressed, the question is, conceding the power of the Text Book Commission to make adoption of text books upon 'basal' subjects or subjects 'required by law' to be taught in the common elementary schools of the state: Can the commission also make a binding and exclusive adoption as to any other books for use in such schools? Can it legally adopt and require the exclusive use of books 'supplemental' or 'supplementary' to the 'basal' text books legally adopted by it?

"This action is brought under the Declaratory Judgment Act; it involves a controversy between a book dealer and the county superintendent of schools. For many years the school authorities of Kenton county have recommended for use in the elementary schools of the county as supplemental or supplementary to the 'basal' text books adopted by the State Text Book Commission, the following publications: Webster's 'Elementary Dictionary,' 'Story Hour Readings,' and Carpenter's 'Around the World with Children.'

"The first mentioned of these books, i. e., the dictionary, serves, as we all know, as a general reference book applicable to all subjects to be taught in the schools; 'Story Hour Readings' is designed to supplement the ordinary grade 'reader,' and Carpenter's 'Around the World with Children' is designed to supplement the ordinary grade 'geography.'

"These books have been recommended, and the county superintendent of schools still recommends, or wishes to recommend, them for use in the elementary schools. There is no compulsion to buy them, and they have never been used or recommended for use to the exclusion of any 'basal' text book adopted by the State Text Book Commission.

"In the year 1924 the State Text Book Commission met for the purpose of making an adoption of text books for the schools of Kentucky. It adopted books upon the fundamental subjects and designated these adoptions as 'basal.' The subjects in this 'basal' adoption were reading, writing, arithmetic, geography, spelling, English, history, civil government, physiology and hygiene, and elementary agriculture. The commission then voted an

adoption of a wide variety of books, some of which are designated in the printed publication of the adoption by the State Text Book Commission as 'Supplemental Texts,' and some as 'Supplementary Readings,' and one as 'Supplementary History.'

"Under the caption of 'Supplemental Texts,' the following books appear (naming them). Under the caption of 'Supplementary Readings' these books appear (naming them). Under the designation 'Supplementary History' appears 'Introductory American History' by Bourne & Benton.

"After the action of the Text Book Commission some of the publishers of books in these supplemental or supplementary lists executed contracts and gave bond in conformity to the law applicable to legal adoption, and are now claiming that they are entitled to have their books used to the exclusion of all others on the same subjects. It will be noted that in the list published as the official adoption of books under the caption of 'Supplemental Texts' there appears: 'Comprehensive Standard Dictionary,' Fernald Vizetelly, and under the heading of 'Supplementary Readings' there appear 'Geography for Beginners' and various readers and readings. The Webster 'Elementary Dictionary,' 'Story Hour Readings' and Carpenter's 'Around the World with Children,' the publications with which we are here concerned, are books of substantially the same character, and under the recommendation of the local authorities they have been in use in the elementary schools of Kenton county in preference to the books above referred to, which are included in the lists of supplemental or supplementary books which the Text Book Commission assumed to adopt. . . . The question presented is solely as to the power of the State Text Book Commission, but, before examining the present statute to ascertain the extent of this authority, it may be well to consider the legislative purpose in the enactment of the Uniform Text Book Law in Kentucky.

"The most obvious reason was to save money for the parents of the children by inducing a lower price for school books by reason of the quantity of books that would be sold and the elimination of all sales expense. It is apparent that publishers under a state award could make a price for their books vastly less than that at which they could afford to furnish them under county,

city or local school competition. Another reason was that the continuance of the uniform system would establish an exchange value in the books, and yet another reason that suggests itself was that the general quality of the book obtained, both as to mechanical make-up and scholarly content, would be enhanced by reason of the more competent selection created by a proper state commission.

"Now, if all these worthy objects were to be secured, it clearly would not do to appoint a commission and turn it loose with absolute freedom to select without limitation whatever books it saw fit regardless of the necessity or of price. Such unlimited power would utterly defeat every purpose sought to be served. It was essential that the power should be carefully restricted as to the subjects of which the books should treat and as to the price to be paid. This legislative intent is especially apparent in the first Uniform Text Book law enacted in Kentucky, in the year 1904. At that time, as also now, section 4383 of the Kentucky Statutes provided: 'The instruction prescribed by the board *shall embrace spelling, reading, writing, arithmetic, English grammar, English composition, geography, physiology and hygiene, and the history of Kentucky.*' 'After July 1, 1893, the nature and effect of alcoholic drink and narcotics upon the human system shall in all schools supported wholly and in part by the state be taught as thoroughly as other required studies to all pupils studying physiology and hygiene as a part of this branch.'

"The act of 1904 provided in section 2: 'The State Text Book Commission shall . . . receive sealed bids or proposals from the publishers of school books for furnishing text books on the branches *required to be taught* in the common schools of the Commonwealth, *namely: Spelling, reading, writing, arithmetic, English grammar including language lessons, English composition, geography, physiology and hygiene, civil government, United States history, and the history of Kentucky* . . . provided that no bid or proposal shall be considered by the said State Text Book Commission or contract made for the aforesaid books to be sold at retail at a greater price than the following (here follows list of books and prices).

"After thus specifying the books that were within the power of the commission to adopt, the Act provided

(section 4) that they should be used 'uniformly and exclusively in all the common schools,' but that 'Nothing in this act shall prevent the use of supplemental books in any school in which the series provided for in this act is continuously and in good faith used.' It is thus apparent that this act contemplated the adoption by the commission of the books specified, and no others, and for fear that this limitation upon the power might be questioned, it was distinctly provided that it was not to be understood as in anywise forbidding or restricting the use of such other books in the schools as the judgment of the local school authorities might suggest. The limitations contained in this original act have been carried through all of the changes during the last twenty-two years, and the present statute now in force defining and limiting the powers of the State Text Book Commission are in identically the same language except that the subjects to be taught are not specifically enumerated. The act of 1904 was applicable only to the common elementary schools. The present law is applicable to high schools as well as to the elementary schools, and so, when it comes to the statement of the authority of the Text Book Commission, the language was broadened so as to cover books for high schools, but the only change in so far as the elementary schools are concerned was that the present law does not repeat specifically the subjects required to be taught by section 4383 of the statutes. The present law, which is section 4421a-10 of the statutes, is as follows: 'The uniform series of text books to be selected by the commission shall include all branches *required or that may hereafter be required by law to be taught* in the common elementary and high schools of the state except as herein provided; and no text book shall contain anything of a partisan, sectional or sectarian character.'

"The section of the statutes above quoted limits the State Text Book Commission then to the adoption of text books upon subjects that are *'required by law'* to be taught in the elementary schools, and these subjects are those set forth in section 4383 above referred to and the act of 1918 requiring that the subject of elementary agriculture must be taught, which is section 4369b of the Kentucky Statutes, and the recent act of the legislature requiring Bible readings in the schools. A reading of the statute can leave no doubt as to the limitation upon

the authority of the Text Book Commission, but all questions as to the meaning of the language used have been removed by the opinion of the Court of Appeals of Kentucky in the case of State Text Book Commission v. Weathers, 184 Ky. 748, where it is said: *'The State Text Book Commission can make no selection of subjects, for the subjects taught in the common schools are determined and adopted by statute,* section 24, chapter 24, Acts of 1916, and chapter 82, Acts of 1918, . . . whereas the duties of the State Text Book Commission are limited to providing on the best terms possible books required for teaching and studying the subjects prescribed by the statutes . . . as well said by counsel, 'The children of Kentucky do not buy and pay for subjects—they purchase and pay for books.'

"It must, therefore, be taken as the definitely established law in this state, that the Text Book Commission is restricted and limited, in so far as the common elementary schools are concerned, to the adoption of text books upon these subjects, and these alone (section 4383, section 4369-B, Kentucky Statutes): spelling, reading, writing, arithmetic, English grammar, English composition, geography, physiology and hygiene, civil government, United States history, the history of Kentucky, and elementary agriculture.

"A reference to the published circular purporting to give in full the official adoptions by the State Text Book Commission will show that the Text Book Commission understood that its authority was limited as above indicated, for it made a full and complete adoption of text books covering the subjects required by law to be taught in the common elementary schools. These it designated as 'basal,' and the commission was careful to specify the subjects so that conformity would appear to the statutory requirements with reference to the subjects upon which they might adopt text books, and it is further to be noted that in the only official notification required by statute of the adoptions by the State Text Book Commission the subjects named in the statute are alone mentioned, and the books designated by the State Text Book Commission as 'basal' were alone listed.

"Section 4421A-16 provides: 'On or before the first day of August of each year it shall be the duty of the State Board of Education to have printed a complete list of all the books adopted under the provisions of this

act, stating the net contract price, the exchange and the retail price of each, and to distribute such lists to the county superintendents in such quantity as they may request, etc.' The State Board of Education complied with this provision of the law, and, as stated above, the lists which it sent out contained only the books designated by the State Text Book Commission as 'basal.'

"Just what motive actuated the State Text Book Commission in voting to adopt a number of books upon a variety of subjects and to publish them as 'supplemental' or 'supplementary' adoptions, does not appear, but the members of the commission may have intended their action to be a mere recommendation, which we hold they had the right to do, and perhaps their recommendation might carry as much or even greater weight than any other school authority in the state, but clearly the Text Book Commission had no authority at all to make an adoption of books beyond the power granted it as set forth in the statutes. It could adopt books upon subjects 'required by law to be taught' in the common elementary schools. The subjects *required by law* to be taught are clearly designated by statute. The adoption of books upon any other subject is, therefore, wholly without warrant. We are unable to find in the law the slightest indication that the commission was free to adopt school books generally, or books upon any subject it saw fit, though it is clear that the legislature had in mind that other books would be used in the schools.

"Section 4421a-17 (as does also, in substance, section 4421b-20) provides that the books adopted must be used to the exclusion of all others on the 'same branches,' but that 'nothing *herein shall prevent the use of supplementary text books, but such supplementary books shall not be used to the exclusion of the books prescribed under the provisions of this act.*' So, manifestly, the Text Book Commission was not authorized to make a binding adoption as to all books to be used in the schools. It could not by its action exclude from the schools books on every variety of subject there taught by making an adoption of a book on such subjects, nor could it compel teaching of a subject by the adoption of a book on that subject. Not only would such an unrestricted grant of power utterly defeat the primary purpose of the act, which was to establish a uniform system of text books upon the fundamental subjects to be taught, but it would open the door to

unlimited trickery, bargaining, and perhaps corruption, in an effort to foist books upon the schools of no value in the scheme of instruction there taught.

"Not only is the law undoubted that the authority of the commission is limited to the adoption of text books upon the subjects 'required by law' to be taught, but it seems apparent that it cannot adopt unlimited books even upon such subjects. For instance, it is the duty of the commission to adopt a 'First Reader.' Can it adopt ten different first readers? And so with the subjects of spelling, history, arithmetic, etc., can it adopt books of ten different publishers on each of these subjects? If so, what becomes of the desired uniform series of text books? If there are ten books on each subject, which one is to be used? If the selection is to be left to the teacher, ten teachers may use ten different books on the same subject. The commission itself could not make a selection because the law declares the books selected by it must be used to the exclusion of all others. If it selects one it necessarily excludes all the rest, and why name ten, when it intends to select one and exclude nine? Manifestly, there is no escaping the plain intendment of the law. The commission may adopt *one* book on each subject, and only one. It may adopt a 'spelling book,' a 'history,' a 'reader,' an 'arithmetic,' etc. Of course, it may adopt such books for each grade, as for instance, a first reader, a second reader, a primary arithmetic or a practical arithmetic, a primary writing book or a secondary writing book, etc. In the original Text Book Act (1904) (*supra*) the law gives exactly this specification in naming the top price that may be charged for books. It specifies the book, as, for instance, a first reader, and then provides that the price shall not be greater than a certain amount. Clearly, then, the meaning of the law is that the Text Book Commission may adopt a text book upon each of the subjects required by law to be taught, and that is the limit of its authority. Now in the adoption of 1924-29 the commission did adopt one text book on each of the subjects required by law to be taught. It called these subjects 'basal,' but it might more properly have described them as 'statutory' subjects. It should have stopped there, but it did not. For some reason, it proceeded to adopt a great variety of books, labelling them 'supplemental' or 'supplementary.' Included in this list are several varieties of readers. As a 'basal'

or 'statutory' adoption it had selected a series of read-
ers, and under the law these must be used to the exclusion
of all others for that purpose.   But, if these readers on
the supplemental or supplementary list constitute a legal
adoption, then they, too, must be used to the exclusion
of all others.   The absurdity of the proposition is ap-
parent.   On the supplemental list, under the subject
'Character and Education,' we find the adoption of a
book entitled 'Golden Deeds,' and under the subject of
'Home Economics' a book entitled 'Elementary Home
Economics.'   Can it be contended that these subjects are
within the statute covering subjects required to be
taught?   And so there is a teacher's manual for arith-
metic, no doubt of value to teachers, but certainly not to
school children, and clearly not a text book upon a sub-
ject required to be taught to children.   It doubtless in-
structs the teacher as to the best manner of teaching
children arithmetic, but it could not be used by a child.
Then there is the dictionary.   The commission assumed
to adopt a dictionary.   It is not necessary to go into the
question as to whether or not a dictionary may properly
be described as a text book.   It is perhaps universally
known as, and it is, essentially, a reference book, but, if
it be conceded that it is a text book, upon what subject
is it a text book?   No doubt, it is a useful book of refer-
ence on many subjects, perhaps upon all subjects re-
quired by law to be taught, but surely it is not a text book
upon the subject of reading, writing, spelling, history,
arithmetic, civil government or elementary agriculture,
the subjects named in the statute.   None of these sub-
jects could be taught using the dictionary as a text book,
however useful it may be in all of them as an auxiliary
reference book.   And so, continuing the examination of
the books placed by the Text Book Commission on its
supplemental or supplementary lists, we find such books
as 'Cherry Tree Children,' 'Red Feather,' 'Wind Mills
and Wooden Shoes,' 'Field and Tree,' 'Geography for
Beginners,' 'Nature Study for Boys and Girls,' 'Grass-
hopper's Green Garden,' 'American History for Little
Folk,' 'Uncle Jim, the Fire Chief,' 'Favorite Studies,'
'Pioneers of America,' etc.   Doubtless all of these publi-
cations have their value, and, no doubt, the books are
all interesting and instructive to children, but what of
them are text books on subjects *required by law* to be
taught in the common elementary schools?   It seems

clear that the Text Book Commission never had the slightest idea that it was making a binding adoption in so far as these supplemental or supplementary books are concerned. The school authorities in the state did not recognize the adoption as legal except in so far as the 'basal' books were concerned. The State Board of Education, which had the duty of publishing the work of the State Text Book Commission, deliberately eliminated from the official report of the commission's work all of the so-called supplemental or supplementary books and included in the list sent out by it only the 'basal' books. The superintendents of public instruction of the state, and at least one attorney general of the state, have all expressed the opinion that the list of supplemental or supplementary books was merely recommendatory and had no binding effect whatsoever.

"Under all of the reasons and under all of the circumstances disclosed by this record, the following seems the undoubted law governing the question here presented, and it is so adjudged:

"First: The State Text Book Commission had authority to adopt text books for the common elementary schools only on the subjects named in the statutes of Kentucky.

"Second: It had authority in the adoption of books upon subjects named in the statute to select one text book upon each subject, as said subject was taught in each of the grades of the common elementary schools, and such books, when so adopted, must be used to the exclusion of all others on the same subject.

"Third: The Uniform Text Book Act does not contemplate that the books legally adopted by the State Text Book Commission should exclude from the schools all other text books, but, to the contrary, clearly indicates that such books can be used.

"Fourth: As to these latter books, the local school authorities are free to recommend for use such as, in their judgment, best suit the needs of their pupils, and may, if they see fit, recommend the books mentioned in the petition, namely: Webster's 'Elementary Dictionary,' Carpenter's 'Around the World with Children,' and 'Story Hour Readings.' "

The misconception of the federal judge, who rendered the opinion *supra*, of the purpose underlying our involved statutes whereby he arrived at a different con-

clusion as to their proper construction to that reached by the learned trial judge of this case below, as well as his unsatisfactory reasoning, may be illustrated by an excerpt from his opinion, saying: "The answer to the question whether the commission had power to adopt supplemental or supplementary books for use as text books to the exclusion of all others in all the common schools depends on their right to classify the books which they adopt. The State Board of Education is required (sec. 4382) 'to prescribe and publish a public graded course of study for the common schools specifying the order of studies . . . ' The commission is required (sec. 4421a-7) 'to adopt . . . a uniform series or system of text books.' Now is seems reasonable to suppose that the commission could adopt one set of books for precocious pupils who got high rank, and another for backward ones; that, for example, advanced students in United States History might be given books involving a more special treatment of history in its political or constitutional aspect than the ordinary school history affords. In a similar way, I think the commission may adopt further books for study for pupils whose inclination or larger means makes their acquisition desirable. This seems to be a reasonable power of classification incidental to the right to adopt at all, and the adoption of a book as a text book, if it can be properly called such, and if it bears directly on the subjects selected by the board of education, removes it from those books termed 'supplementary' in the statute which may be used but not 'to the exclusion of the books prescribed. (Sec. 4421a-17).

"It is always to be remembered that 'the books adopted by the commission as the uniform system of text books for the state shall be introduced and used to the exclusion of all others. . . . ' If the county boards can vary the list 'the uniform system of text books' which the statute aims at will be destroyed. It is not necessary to go the length of complainant's contention and to hold that the commission can do more than recommend the books in its list termed 'Supplementary Readings.' Many of them perhaps do not fall within the natural meaning of text books and it is doubtful whether the commission intended to adopt them as such when they are preceded by the caption 'Supplementary Readings' or designed to do more than to recommend

their use. But complainant's dictionary I hold to have been properly adopted as a text book and not to be excluded from the protection of the statute because classified as a book that pupils need not buy who do not wish any dictionary for use in school or cannot afford to pay for."

It will be seen therefrom that the writer of that opinion among what we conceive to be erroneous conclusions broadly stated that the State Text Book Commission could compulsorily adopt different books for different students based upon their superior intelligence as well as financial standing; and also erroneously construed section 4382 of our present statutes to empower the State Board of Education in prescribing the courses of study in the common schools to thereby authorize the State Text Book Commission to adopt books for such courses other than those prescribed and *required to be taught* by the statute (see sections 4383 and 4421a-10 of the statutes), when under our interpretation of section 4382 the Board of Education prescribed the grades and the courses of study for each grade, but to compulsorily include no branch of study that is not prescribed by statute. By such reasoning the writer of that opinion virtually eliminated section 4421a-17 and section 4421b-20, specifically prescribing that, "Nothing herein shall prevent the use of supplementary text books, but such supplementary text books shall not be used to the exclusion of the books prescribed under the provisions of this act." The construction contended for and adopted in that opinion would also entirely destroy the purposes intended to be accomplished by the enactment of our statutes with reference to the adoption of uniform text books in the public schools. Under it, unless a younger pupil in the same family possessed the same grade of intelligence of an older pupil who had been supplied with books, then the former would have no use for the books adopted for his more intelligent senior; nor would the adopted books under that classification possess the exchangeable value that they otherwise would if the uniform adoption was made under the trial court's construction of the statutes in this case, and which we have herein adopted. Other reasons could be assigned in demonstration of the erroneous theory of the federal opinion, but the ones given are more than sufficient to demonstrate its incorrectness and we will not further lengthen this opinion by a continued analysis of it.

Having arrived at the above conclusion it is obvious and it necessarily follows, that an attempted adoption of supplementary books by the State Text Book Commission would not require the exclusive use in the public schools, nor would it authorize the commission to enter into a contract for the furnishing of them as is necessary with reference to the adoption of text or basal books. That being true, the one who so contracted as to the recommended or futile adoption of such supplementary books would acquire no right for their exclusive furnishing, and the fact that he may have executed bond for the performance of his contract does not enlarge his rights, since both the contract and the bond were each unauthorized.

Wherefore, the judgment is affirmed.